877 So.2d 663 (2004)
Charles GLOBE, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-39.
Supreme Court of Florida.
March 18, 2004.
Rehearing Denied July 1, 2004.
*666 Steven L. Seliger of Garcia & Seliger, Quincy, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Cassandra K. Dolgin, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Charles Globe appeals his conviction of first-degree murder and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the conviction and sentence.

FACTUAL AND PROCEDURAL BACKGROUND
Globe was convicted of the July 3, 2000, first-degree murder of Elton Ard. Ard was a fellow inmate at the Columbia Correctional Institution (CCI). Globe and his codefendant and fellow inmate, Andrew D. Busby,[1] had been planning to murder an inmate or correctional officer for two weeks before Ard's murder. Ard was Busby's cellmate and was one of seven potential victims targeted by Globe and Busby because he was harassing Busby. Globe and Busby talked for days about killing Ard and devised a plan to do so. Using part of a linen sheet and broken ballpoint pens, Globe made two garrotes approximately two weeks prior to the murder. Globe intended to use these garrotes to strangle his victim.
On the morning of July 3, 2000, at approximately 7 a.m., Globe slipped into the prison cell shared by Ard and Busby. After locking the cell door and covering the window, Globe grabbed Ard around the neck and they began to struggle. Globe placed one of the garrotes around Ard's *667 neck, but it broke as he and Busby were strangling Ard. Ard pled for his life, offering to give Globe all of his money, a total of forty-five dollars. Globe told Ard that he didn't want his money "but his fucking life." Globe then struck Ard in the face, causing him to bleed. Globe flushed the broken garrote down the toilet and after discovering that Ard was still alive tied the second garrote around Ard's neck. Globe then lit a cigarette and watched Ard gasp for air six times before he finally died. After Ard died, Globe took the garrote from Ard's neck and tied it around Ard's wrist. He put a cigarette in Ard's mouth and placed a lighter in his hand.
During a prisoner count at approximately 8:40 a.m., correctional officer Tonya Nix found Globe locked inside Ard and Busby's cell. Globe and Busby were smoking cigarettes. Ard had a cigarette in his mouth and appeared to be dead. Abrasions and other marks were visible on Globe's face. Nix had Globe and Busby removed from the cell, which was secured until the Florida Department of Law Enforcement (FDLE) arrived to begin their investigation. A nurse at CCI found that Ard did not have a pulse or blood pressure and was not breathing. The following day Dr. Matthew Areford performed an autopsy on Ard, determining that he had died from strangulation and that his death was a homicide. Dr. Areford testified that Ard was involved in a scuffle shortly before he was strangled to death.
Evidence recovered from the murder scene included photographs of writing on the prison wall, photographs of bloody fingerprints, the cigarette lighter found in Ard's hand, the cigarette from Ard's mouth, the magic marker used to write on the wall, and the wingtip piece from a pair of glasses. The phrases "Call FDLE" and "Remember Andy and K.D., 7/3/2000," were written in magic marker on the cell door. "Don't forget to look on the door" was written in magic marker on the cell wall. Karen Smith, a crime laboratory analyst and forensic document examiner with FDLE, testified that Globe had written "Call FDLE" and "Remember Andy and K.D., 7/3/2000." Smith did not express an opinion as to who had written "Don't forget to look on the door." The bloody fingerprints were not of value for identification purposes.
Several hours after the murder, FDLE agent Bill Gootee met with Globe, advised him of his Miranda[2] rights, and asked Globe if he wanted to make a statement. Globe replied, "Not at this time," but did not request an attorney. Gootee terminated the interview and passed this information on to FDLE Agent Don Ugliano. Approximately seven hours later, Ugliano was standing in a hallway and heard Globe say something to the effect of "[t]hat guy doesn't need to be here." Globe had just finished being photographed and Busby was a short distance away inside the inspector's office talking to his father on the phone. Ugliano asked Globe "why," and Globe said, "The whole place is just screwed up. It is all messed up." Ugliano then asked Globe if he was willing to make a statement. Globe answered that he would, if he could be with Busby. After Globe and Busby were advised of their Miranda rights, they gave a tape recorded statement in which they admitted to killing Ard. After the statement was taken, Globe was moved to Florida State Prison and placed under a higher level of security than was available at CCI.
Inspector Jack Schenck, a senior inspector with the Florida Department of Corrections, Office of the Inspector General, interviewed Globe on July 7, 2000, at Florida *668 State Prison. Schenck was present for Globe's July 3, 2000, statement. After being advised of his Miranda rights, Globe discussed how he had been planning to murder an inmate and how he had actually murdered Ard. Counsel was appointed for Globe, and he was arraigned on September 7, 2000. While sitting outside the judge's chambers that day, Globe said to Ugliano, "It's stupid to have to go through all this bullshit. I know I am going to get the needle for killing him." Ugliano told Globe that he was not allowed to speak to him anymore because Globe was represented by an attorney. Globe replied, "Shit. We have already confessed to killing the dude. What's it matter?"
The State introduced as evidence letters from Globe to Special Agents Don Ugliano and Jim Flournoy in which Globe admitted his involvement in Ard's murder. Crime laboratory analyst Thelma Williams identified the prints on each of the three letters as belonging to Globe. Karen Smith identified the handwriting on the letters as that of Globe.
Globe did not testify or present any evidence at the guilt phase of his trial. During his closing argument, defense counsel admitted that Globe was involved in the murder but argued for a verdict of a lesser degree of murder. The jury convicted Globe of first-degree murder on September 11, 2001, and on September 14, 2001, recommended death by a vote of nine to three.
The trial court followed the jury's recommendation and imposed a death sentence, finding and weighing four aggravating factors,[3] no statutory mitigating factors, and eleven nonstatutory mitigating factors.[4] On direct appeal Globe raises eight issues.

I. MOTION TO SUPPRESS
Globe argues that the trial court erred by denying his motion to suppress the July 3 and July 7 statements. The court denied Globe's motion to suppress his statements "[u]pon a finding that the statements were made freely, voluntarily, and knowingly after full and complete advisal and waiver of Miranda rights."

A. APPLICABLE LAW

1. Standard of Review
This Court recently explained the standard of review for orders on motions to suppress:
[A]ppellate courts should continue to accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact *669 that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution.
Nelson v. State, 850 So.2d 514, 521 (Fla.) (quoting Connor v. State, 803 So.2d 598, 608 (Fla.2001)), cert. denied, ___ U.S. ___, 124 S.Ct. 961, 157 L.Ed.2d 797 (2003).

2. Admissibility of Statements
The State must establish, by a preponderance of the evidence, that the waiver of Miranda rights is knowing, intelligent, and voluntary. See Colorado v. Connelly, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); see also Ramirez v. State, 739 So.2d 568, 575 (Fla.1999). Whether Miranda rights were validly waived must be ascertained from two separate inquiries:
First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.
Ramirez, 739 So.2d at 575 (quoting Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). "The `totality of the circumstances' to be considered in determining whether a waiver of Miranda warnings is valid based on the two-pronged approach of Moran may include factors that are also considered in determining whether the confession itself is voluntary." Id.
Further police-initiated questioning of a person in custody is not absolutely foreclosed if he or she invokes the right to remain silent but not the right to counsel. We implicitly recognized the distinction between assertion of the two rights in Traylor v. State, 596 So.2d 957, 966 (Fla.1992):
[I]f the suspect indicates in any manner that he or she does not want to be interrogated, interrogation must not begin or, if it has already begun, must immediately stop. If the suspect indicates in any manner that he or she wants the help of a lawyer, interrogation must not begin until a lawyer has been appointed and is present or, if it has already begun, must immediately stop until a lawyer is present. Once a suspect has requested the help of a lawyer, no state agent can reinitiate interrogation on any offense throughout the period of custody unless the lawyer is present, although the suspect is free to volunteer a statement to police on his or her own initiative at any time on any subject in the absence of counsel.
Id. at 966.
In Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the United States Supreme Court held that resolution of the question of the admissibility of statements obtained after a person in custody has invoked his or her right to remain silent depends upon whether the person's decision to assert his or her "right to cut off questioning" was "scrupulously honored." In holding that no Miranda violation occurred in Mosley, the Court stated:
This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his *670 resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.
Mosley, 423 U.S. at 105-06, 96 S.Ct. 321.
We applied Mosley in Henry v. State, 574 So.2d 66, 69 (Fla.1991), when analyzing the resumption of questioning on the same offense after invocation of the right to silence. We recognized that in Mosley the Supreme Court neither set out "precise guidelines" for what constitutes scrupulous adherence to Miranda nor stated that "any factor standing by itself would be dispositive of the issue." Id. at 69. However, we recognized five factors the Court in Mosley found to be relevant:
First, Mosley was informed of his rights both times before questioning began. Second, the officer immediately ceased questioning when Mosley unequivocally said he did not want to talk about the burglaries. Third, there was a significant lapse of time between the questioning on the burglary and the questioning on the homicide. Fourth, the second episode of questioning took place in a different location. Fifth, the second episode involved a different crime.

Id. (emphasis added). In Henry, we determined that variance as to one or more of the five factors was not dispositive, and therefore applied a totality of the circumstances approach. We apply the same analysis in this case.

B. APPLICATION OF LAW

1. July 3, 2000, Statement
Globe argues that his right to remain silent was not "scrupulously honored" because of Agent Ugliano's request for a statement approximately seven hours after he declined to give a statement to Agent Gootee. The trial court's factual findings are supported by competent, substantial evidence and are entitled to a presumption of correctness. Applying the five factors set out in Mosley and Henry to the facts in this case, it is evident that four of the five factors are present: (1) Miranda warnings were given several times, including right before each request for a statement; (2) interrogations ceased immediately when Globe expressed his desire to remain silent; (3) there was a significant time lapse between the questioning in that the second request for a statement was made seven and a half hours after the first request; and (4) the second questioning took place at a different location. We conclude that it is not dispositive that the second questioning involved the same crime. We consider not only that four of the five factors weigh in favor of admissibility but also that when Globe initially invoked his right to silence he said only that he did not want to make a statement "at this time," leaving open the prospect of future questioning on the crime. We hold that Globe's right to remain silent was scrupulously honored. Accordingly, the trial court did not err when it denied Globe's motion to suppress the July 3, 2000, statement.

2. July 7, 2000, Statement
The July 7 statement was taken at Florida State Prison, where Globe had been moved for security reasons. Globe alleges that the July 7 statement was the fruit of the illegally obtained July 3 statement; that it was not made voluntarily, intelligently, or knowingly; and that it was taken in violation of Florida Rule of Criminal Procedure 3.130.
*671 Globe's first argument fails because the July 3 statement was not illegally obtained, as discussed above. Globe's second argument also is without merit. Before making his July 7 statement, Globe was advised of his Miranda rights by Agent Ugliano. As the United States Supreme Court said in Moran, the proper inquiry is whether the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension. Moran, 475 U.S. at 412, 106 S.Ct. 1135. In this case, Globe was read his rights. He was asked if he understood his rights and responded, "Sure." He was then asked, "With your rights in mind, would you like to answer questions and make a statement at this time?" Although Globe's response was inaudible on the tape recording, he proceeded to make a statement. All of this occurred after Globe had been read his rights twice before on July 3. The trial court's factual findings are supported by competent, substantial evidence and are entitled to a presumption of correctness. The totality of the circumstances in this case demonstrate that Globe voluntarily waived his rights and was fully aware of the consequences of his decision. Globe's right to remain silent was scrupulously honored.
Globe also argues that the July 7 statement is inadmissible because he was in custody on July 3 and should have been brought before a judge within twenty-four hours pursuant to Florida Rule of Criminal Procedure 3.130. Florida Rule of Criminal Procedure 3.130 states that "every arrested person shall be taken before a judicial officer ... within 24 hours of arrest." (Emphasis added.) Globe asserts that although he was not formally arrested, he was de facto arrested when he was removed from the open population at Columbia Correctional and was taken to Florida State Prison. The state argues that Globe was in custody pursuant to a lawful conviction unrelated to the murder for which he was under investigation.
Globe relies upon Anderson v. State, 420 So.2d 574, 576 (Fla.1982), as support for his argument. This Court distinguished Anderson in Keen v. State, 504 So.2d 396, 400 (Fla.1987), stating:

Anderson is clearly distinguishable as there the evidence presented to this Court showed that Anderson had been indicted prior to being taken into custody by Florida law enforcement officials who drove Anderson by car for four days from Minnesota back to Florida. The deputies were aware that Anderson had no counsel in Minnesota and that he desired appointed counsel once returned to Florida. Holding that Anderson's statement should have been suppressed, we found "significant" the fact that the statement at issue came "far after" Anderson should have been brought before a judicial officer "with the attendant advice of rights and appointment of counsel." Id. at 576. We also found that the record failed to show a valid waiver. Id.

Anderson is also distinguishable from Globe's case. At the time of the July 7 statement, Globe was not under an indictment, had not asserted his right to counsel, and had validly waived his rights.
Additionally, we noted in Chavez v. State, 832 So.2d 730, 753 (Fla.2002), cert. denied, 539 U.S. 947, 123 S.Ct. 2617, 156 L.Ed.2d 637 (2003), that where a defendant has been sufficiently advised of his rights, a confession that would otherwise be admissible is not subject to suppression merely because the defendant was deprived of a prompt first appearance. "[W]hen a defendant has been advised of his rights and makes an otherwise voluntary statement, the delay in following the *672 strictures of [rule 3.130] must be shown to have induced the confession." Chavez, 832 So.2d at 753 (quoting Keen v. State, 504 So.2d 396, 400 (Fla.1987)); see also Williams v. State, 466 So.2d 1246, 1248 (Fla. 1st DCA 1985) (reflecting that no per se rule required suppression of confession  which was suppressed on other grounds  because of delay of first appearance until thirty hours after arrest). A first appearance "serves as a venue for informing the defendant of certain rights, and provides for a determination of the conditions for the defendant's release." Chavez, 832 So.2d at 752. In this case, Globe was repeatedly advised of his Miranda rights, would not have been subject to release because of his prior convictions, and did not invoke his right to counsel. Additionally, Globe made his most incriminating statement, the July 3 statement, less than twenty-four hours after he alleges he was de facto arrested. There is no showing that the delay in following the strictures of rule 3.130 induced the confession. Therefore, under the narrow circumstances in this case, we hold that the trial court did not err in denying the motion to suppress. However, we remind the State of its obligation under rule 3.130 to take every arrested person, including those already in custody on other grounds, before a magistrate within twenty-four hours of arrest.

II. ADMISSION OF JOINT CONFESSION
Globe argues that the trial court erred when it denied his motion in limine in regard to Busby's statements during the joint confession. The trial court denied the motion "[u]pon a finding that the recorded statements made by Andrew Busby were adopted by the Defendant as his own."

A. APPLICABLE LAW

1. Standard of Review
"A trial judge's ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion." Blanco v. State, 452 So.2d 520 (Fla.1984).

2. Merits
In Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), the Court reiterated the rule in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and held that the introduction of a nontestifying codefendant's confession which is not directly admissible against the defendant violates the defendant's confrontation rights. The Court further held that although introduction of the defendant's own interlocking confession cannot cure the Confrontation Clause violation caused by the introduction of the nontestifying codefendant's confession, it might, in some cases, render that violation harmless. Cruz, 481 U.S. at 193-94, 107 S.Ct. 1714.
Recently, in Crawford v. Washington, ___ U.S. ___, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court receded from the Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), "indicia of reliability" test and held that "[w]here testimonial evidence is at issue, ... the Sixth Amendment demands what common law required: unavailability and a prior opportunity for cross-examination." Crawford, 124 S.Ct. at 1374.
We have previously recognized that admissions by acquiescence or silence do not implicate the Confrontation Clause. See Nelson v. State, 748 So.2d 237 (Fla.1999); see also United States v. Kehoe, 310 F.3d 579, 590-91 (8th Cir. 2002) (holding that the Confrontation Clause did not guarantee the defendant the right to cross-examine a speaker whose statements *673 were imputed to the defendant as adoptive admissions of a party opponent), cert. denied, 538 U.S. 1048, 123 S.Ct. 2112, 155 L.Ed.2d 1089 (2003).
In Nelson, we held that because the codefendant's statements were admitted as admissions by silence, there could be no Confrontation Clause violation. We presented several factors that should be present to show that an acquiescence to the codefendant's statements did in fact occur. These factors include the following:
1. The statement must have been heard by the party claimed to have acquiesced.
2. The statement must have been understood by [the defendant].
3. The subject matter of the statement is within the knowledge of the [defendant].
4. There were no physical or emotional impediments to the person responding.
5. The personal make-up of the speaker or his relationship to the party or event are not such as to make it unreasonable to expect a denial.
6. The statement itself must be such as would, if untrue, call for a denial under the circumstances.
See Nelson, 748 So.2d at 242 (quoting Privett v. State, 417 So.2d 805, 806 (Fla. 5th DCA 1982)). The essential inquiry thus becomes whether a reasonable person would have denied the statements under the circumstances. Id. (citing McCormick, Evidence, § 270 (2d ed.1972)). Florida has incorporated this rule into its Evidence Code as section 90.803(18)(b), Florida Statutes (2003), which expressly creates a hearsay exception for "[a] statement that is offered against a party and is: ... [a] statement of which the party has manifested an adoption or belief in its truth."

B. APPLICATION OF LAW
In this case, Globe was present during Busby's statement and had a chance to contradict what Busby said. A review of the transcript in this case makes it clear that Busby's statements were adopted by Globe. Instead of contradicting Busby's statements, Globe verbally affirmed what Busby said and added significant details to Busby's statement. The statements were properly admitted as adoptive admissions[5] pursuant to section 90.803(18)(b). As we previously noted, statements admitted as adoptive admissions do not implicate the Confrontation Clause. The trial court did not abuse its discretion when it denied Globe's motion in limine.

III. PENALTY PHASE INSTRUCTIONS
Globe argues that the trial court erred by instructing the jury that it was giving an "advisory sentence," in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Caldwell and Ring involve independent concerns. Ring's focus is on jury findings that render a defendant eligible for the death penalty, while Caldwell centers on the jury's role in the decision to impose death upon death-eligible defendants. Defense counsel raised the Caldwell argument but did not raise the Ring argument before the trial *674 court. Therefore, Ring does not affect our analysis on the Caldwell issue raised in this case. Additionally, the instructions given to the jury in this case were from Florida Standard Jury Instruction (Criminal) 7.11. This Court has repeatedly held that the Florida Standard Jury Instructions are in compliance with Caldwell. See Floyd v. State, 850 So.2d 383 (Fla.2002), cert. denied, ___ U.S. ___, 124 S.Ct. 1040, 157 L.Ed.2d 902 (2004); Brown v. State, 721 So.2d 274 (Fla.1998); Burns v. State, 699 So.2d 646 (Fla.1997). Accordingly, Globe's claim is without merit.

IV. RING CLAIMS
Globe argues that Florida's capital sentencing statute and his death sentence violate the Sixth and Fourteenth Amendments under Ring. This Court has recently addressed this argument in another case and denied relief. See Jones v. State, 845 So.2d 55 (Fla.2003). Additionally, the aggravating factors in this case included Globe's prior violent felony convictions. Globe committed the Ard murder while serving prison sentences for his 1985 convictions on two counts of sexual battery, one count of kidnaping, and two counts of robbery. Because these felonies were charged by indictment and a jury unanimously found Globe guilty of them, the prior violent felony aggravator alone clearly satisfies the mandates of the United States and Florida Constitutions. See Doorbal v. State, 837 So.2d 940, 963 (Fla.), cert. denied ___ U.S. ___, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). Globe's claim is without merit.

V. SENTENCING ORDER
Globe argues that the court relied upon nonstatutory aggravating factors, applied a mandatory death sentence, and failed to give "full effect" to nonstatutory mitigation, all in violation of Florida law and the Eighth and Fourteenth Amendments of the United States Constitution.

A. APPLICABLE LAW

1. Standard of Review
The weight to be accorded an aggravating or mitigating factor is within the discretion of the trial court and will be affirmed if based on competent, substantial evidence. See Sexton v. State, 775 So.2d 923, 934 (Fla.2000).

2. Aggravating Factors
In Kilgore v. State, 688 So.2d 895 (Fla.1996), we considered whether language in the sentencing order was inappropriate and necessitated a reversal of the death sentence. The sentencing order stated:
Under certain circumstances the state not only has the right, but the obligation, to take the life of convicted murderers in order to prevent them from murdering again. This is one of those cases. To sentence Mr. Kilgore to anything but death would be tantamount to giving him a license to kill.
Kilgore, 688 So.2d at 899. Kilgore argued that the "license to kill" language indicated that the trial judge failed to consider any sentence other than the death penalty. We disagreed and held that the sentencing order was simply an attempt by the judge to evaluate the specific evidence in this case and independently apply it to Kilgore. Id. at 900. As the United States Supreme Court recognized in Sumner v. Shuman, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987):
Past convictions of other criminal offenses can be considered as a valid aggravating factor in determining whether a defendant deserves to be sentenced to death for a later murder, but the inferences to be drawn concerning an inmate's character and moral culpability *675 may vary depending on the nature of the past offense. The circumstances surrounding any past offense may vary widely as well.... Even if the offense was first-degree murder, whether the defendant was the primary force in that incident, or a nontriggerman like [the defendant], may be relevant to both his criminal record and his character.
Id. at 81, 107 S.Ct. 2716.

3. Mitigating Factors
In Francis v. State, 808 So.2d 110, 140 (Fla.2001), we considered whether the trial court improperly considered the defendant's sanity and competency in diminishing the weight accorded to a mental health mitigating circumstance. We recited the applicable law as follows:
A finding of sanity does not preclude consideration of the statutory mitigating factors concerning a defendant's mental condition. See, e.g., Morgan v. State, 639 So.2d 6, 13 (Fla.1994) (finding error in trial court's rejection of mental mitigators on the basis that the defendant was sane); Knowles v. State, 632 So.2d 62, 67 (Fla.1993) (remanding for resentencing where trial court failed to find statutory mental mitigation because the defendant was sane even though evidence indicated that defendant suffered from organic brain damage and that he was in an acute psychotic state at the time of the murder); Huckaby v. State, 343 So.2d 29, 33-34 (Fla.1977) (vacating death sentence where trial court completely ignored evidence of mental mitigation partially on the basis that the defendant understood the difference between right and wrong); cf. Smith v. State, 407 So.2d 894, 902 (Fla.1981) (declining to follow Huckaby where the trial court considered mental mitigation, but found that the testimony did not compel application of mental mitigators). Francis, 808 So.2d at 140. Mental health experts established in Francis that the defendant suffered from mental illness, although both experts testified that the defendant could at all times distinguish between right and wrong and was capable of planning and executing the crimes as well as his attempts at covering up his misdeeds afterward. See id. We held in Francis that the court did not refuse to consider mental mitigation, noting that the trial court gave the mitigator "some weight," and noted that "the weight to be assigned to a mitigating factor lies within the sound discretion of the trial court." Id. at 141 (citing Mansfield v. State, 758 So.2d 636 (Fla.2000), and Campbell v. State, 571 So.2d 415, 420 (Fla.1990)).

B. APPLICATION OF LAW

1. Aggravating Factors
The pertinent part of the trial court's sentencing order states:
WEIGHT OF AGGRAVATORS
1. The first aggravating circumstance is: "The crime for which you, CHARLES A. GLOBE, are to be sentenced was committed while you had been previously convicted of a felony and were under sentence of imprisonment."
a. Corrections serve the twin objectives of deterrence and punishment.
b. You are currently serving three life sentences. You have no release date. Your only hope of release from prison is escape.
c. Without the death penalty, there is no deterrence. Without the death penalty, there is no punishment.
d. This aggravating circumstance is accorded great weight. Assuming that all the above-discussed mitigating circumstances do exist, and all the mitigating circumstances proffered by the *676 Defense do exist, this aggravating circumstance standing alone outweighs any and all those mitigating circumstances.
Globe specifically alleges that the court's reliance upon the "no deterrence" and "no punishment" statements constitutes nonstatutory aggravation and implies a mandatory death sentence. This argument is without merit. The court was not detailing additional aggravators but was merely evaluating the facts of this case and providing support for the amount of weight given to the statutory aggravating factor. See, e.g., Kilgore, 688 So.2d at 900. The language used in this case does not imply a mandatory death sentence. The sentence imposed in this case was the result of a weighing of the aggravating and mitigating factors, as is evidenced by the sentencing order. The findings of the trial court are supported by competent, substantial evidence, and there is no evidence that the trial court abused its discretion. Globe's claim is without merit.

2. Mitigating Factors
Globe argues that the court improperly failed to give "full effect" to nonstatutory mitigation because Globe was sane and had not established statutory mitigating factors. In discussing the mitigating circumstances of Globe's childhood abuse by his mother and his personality disorder, the trial court stated that the persuasiveness of these mitigating factors was substantially lessened by the following circumstances:
I. The testimony of the Defense psychologist that you knew the difference between right and wrong.
ii. The testimony of the Defense psychologist that you understood the nature and consequences of your acts.
iii. The testimony of the Defense psychologist that you understood the criminality of your conduct.
iv. The testimony of the Defense psychologist that you had the capacity to conform your conduct to the requirements of law.
Globe asserts that the court wrongfully relied upon Globe's sanity and upon the nonexistence of statutory mitigation to reduce the weight of these mitigating factors. This is not the case. As we stated in Francis, while a finding of sanity does not preclude consideration of the statutory mitigating factors concerning a defendant's mental condition, no rule of law states that the trial court must ignore the findings in weighing the mitigating factors. The court did not find that Globe's nonstatutory mental health mitigators were obviated by the finding of sanity. The court did, in fact, give the mitigating factors "slight weight" and "little weight." It is well-settled law that the weight to be assigned to a mitigating factor lies within the sound discretion of the trial court. See Francis, 808 So.2d at 140. The court did not abuse its discretion. Globe's claim is without merit.

VI. PRINCIPAL INSTRUCTION
Globe asserts that the principal instruction was wrongfully given in this case. The State argues that Globe's argument is procedurally barred, and even if it is not barred, the instruction is supported by direct evidence and any error is harmless.

A. APPLICABLE LAW
Florida Rule of Criminal Procedure 3.390(d) states:
No party may raise on appeal the giving or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party *677 objects and the grounds of the objection. Opportunity shall be given to make the objection out of the presence of the jury.
"Issues pertaining to jury instructions are not preserved for appellate review unless a specific objection has been voiced at trial," and absent an objection at trial can be raised on appeal only if fundamental error occurred. Lawrence v. State, 831 So.2d 121, 137 (Fla.2002) (quoting Overton v. State, 801 So.2d 877, 901 (Fla.2001)). "Fundamental error is defined as the type of error which `reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.'" Lawrence, 831 So.2d at 137 (quoting Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla.1998)).

B. APPLICATION OF LAW
At the jury instruction conference, the defense stated the following in regard to the principal instruction:
Your honor, just in plain, simple terms, if one of the jurors thinks that Mr. Busby struck the fatal blow or whatever, under the principal instruction that lays over to my client. I think if the principal instruction is not given, the jury will have no law to allow them to lay that blame over.
After being asked by the trial court if he had any further argument, defense counsel stated: "I really  got any other than [the prosecutor] is an indian giver." Although defense counsel disagreed with the giving of the principal instruction, it does not appear from the record that counsel ever objected to the giving of the instruction. As we have noted, "[i]ssues pertaining to jury instructions are not preserved for appellate review unless a specific objection has been voiced at trial." Lawrence, 831 So.2d at 137. Defense counsel's "objection" was inadequate, and Globe's claim is procedurally barred.

VII. PROPORTIONALITY
Globe argues that the death sentence in this case is not proportionate to other sentences approved by this Court. To determine whether death is a proportionate penalty, this Court must consider the totality of the circumstances of the case and compare the case with other capital cases. Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998).
In this case, the court found four aggravators: (1) prior conviction of a felony and under sentence of imprisonment; (2) prior conviction of a felony involving the use or threat of violence; (3) heinous, atrocious, or cruel (HAC); and (4) cold, calculated, and premeditated (CCP). This Court has made it clear that HAC and CCP are "two of the most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So.2d 90, 95 (Fla.1999). The court found no statutory mitigating circumstances and eleven nonstatutory mitigating circumstances. None of these mitigators were given more than "slight" or "little" weight.
The facts of this case are similar to the facts in a number of other cases involving prison murders where the death sentence has been imposed. See, e.g., Cox v. State, 819 So.2d 705, 723-24 (Fla.2002) (defendant stabbed victim to death; aggravators included HAC and CCP; thirty-two nonstatutory mitigating factors were found with only three being given "some" weight), cert. denied, 537 U.S. 1120, 123 S.Ct. 889, 154 L.Ed.2d 799 (2003); Kilgore v. State, 688 So.2d 895 (Fla.1996) (defendant stabbed the victim and poured caustic liquid on his face and in his mouth; aggravators included that the defendant was under sentence of imprisonment at the time he committed the murder and was *678 previously convicted of a felony involving the use or threat of violence to the person, whereas two statutory mitigating factors and three nonstatutory mitigating factors were found); Marshall v. State, 604 So.2d 799 (Fla.1992) (victim died from blows to the back of the head; aggravators included that the murder was committed by a person under sentence of imprisonment, that the defendant was previously convicted of violent felonies, that the murder was committed while the defendant was engaged in the commission of or an attempt to commit a burglary, and HAC; mitigating circumstances included that the defendant's behavior at trial was acceptable and that the defendant entered prison at a young age); Williamson v. State, 511 So.2d 289, 290-91 (Fla.1987) (defendant repeatedly stabbed the victim to death; aggravators included that the capital felony was committed while defendant was under a sentence of imprisonment, the defendant had been previously convicted of a violent felony, and CCP; no mitigating circumstances were found). Comparing the circumstances in this case to the cases cited above and other capital cases, we conclude that death is proportionate.

VIII. WEIGHT OF MITIGATING FACTORS
Globe argues that the trial court erred by not meaningfully evaluating all of the mitigation evidence presented and by failing to articulate how that evidence applies to the court's sentence.

A. APPLICABLE LAW
Although Globe bases his argument on Campbell v. State, 571 So.2d 415 (Fla.1990), this Court receded from Campbell in Trease v. State, 768 So.2d 1050 (Fla.2000), and stated:
The relative weight given each mitigating factor is within the discretion of the sentencing court. See Campbell v. State, 571 So.2d 415, 420 (Fla.1990). This Court has permitted trial courts to assign "little or no" or "little to no" weight to such factors. See Wike v. State, 698 So.2d 817, 819 n. 1, 823 (Fla.1997)(little or no), cert. denied, 522 U.S. 1058, 118 S.Ct. 714, 139 L.Ed.2d 655 (1998); Sims v. State, 681 So.2d 1112, 1119 (Fla.1996)(little to no). These findings, however, are inconsistent with this Court's holding in Campbell that "a mitigating factor once found cannot be dismissed as having no weight" since "little to no" or "little or no" incorporates the possibility that the mitigating factor though found has been accorded no weight. 571 So.2d at 420; see Gudinas v. State, 693 So.2d 953, 966 (Fla.1997).
We hereby recede from our opinion in Campbell to the extent it disallows trial courts from according no weight to a mitigating factor and recognize that there are circumstances where a mitigating circumstance may be found to be supported by the record, but given no weight. The United States Supreme Court has held that a sentencing jury or judge may not preclude from consideration any evidence regarding a mitigating circumstance that is proffered by a defendant in order to receive a sentence of less than death. See Hitchcock v. Dugger, 481 U.S. 393, 394, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Nevertheless, these cases do not preclude the sentencer from according the mitigating factor no weight. We therefore recognize that while a proffered mitigating factor may be technically relevant and must be considered by the sentencer because it is generally recognized as a mitigating circumstance, the sentencer may determine in the particular case at hand that it is *679 entitled to no weight for additional reasons or circumstances unique to that case. For example, while being a drug addict may be considered a mitigating circumstance, see Mahn v. State, 714 So.2d 391, 401 (Fla.1998), that the defendant was a drug addict twenty years before the crime for which he or she was convicted may be sufficient reason to entitle the factor to no weight. See Kormondy v. State, 703 So.2d 454, 457 (Fla.1997)(The trial judge found that "although the fact of Kormondy's drug addiction is established by the evidence, the Court finds that his addiction is not reasonably established as a non-statutory mitigating factor and gives it no weight.").
Trease, 768 So.2d at 1055.

B. APPLICATION OF LAW
Globe argues that some weight must be given to all established mitigators and that the trial court erred by affording "little" and "slight" weight to nonstatutory mitigating factors. Globe argues that these terms are ambiguous, do not explain the reasoning for the trial court's weighing of nonstatutory mitigation, and preclude a meaningful review of the sentencing order. As we stated in Trease, a trial court may accord little or no weight to a mitigating factor. Trial courts have routinely used terms such as "little" or "slight" to explain the amount of weight given to mitigating factors. See Morris v. State, 811 So.2d 661, 665, 668-69 (Fla.2002); Darling v. State, 808 So.2d 145, 163 (Fla.2002); Reese v. State, 768 So.2d 1057, 1058-59 (Fla.2000). Globe's claim is without merit.

IX. SUFFICIENCY OF THE EVIDENCE
Although Globe did not challenge the sufficiency of the evidence in this case, this Court independently reviews the evidence to determine whether sufficient evidence exists to support a first-degree murder conviction. See Mansfield v. State, 758 So.2d 636, 649 (Fla.2000).
Competent, substantial evidence exists to support Globe's conviction. Globe confessed to Ard's murder, and his confession and the events surrounding the murder are supported by the direct testimony of those involved in this case. The evidence in this case supports both a finding that Globe committed the murder and that the murder was premeditated.

CONCLUSION
We affirm Globe's first-degree murder conviction and death sentence.
It is so ordered.
WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, J., concurs specially with an opinion, in which ANSTEAD, C.J., and LEWIS, J., concur.
ANSTEAD, C.J., concurs as to the conviction and concurs in result only as to the sentence.
PARIENTE, J., specially concurring.
I concur in the majority's affirmance of the conviction and sentence and agree that the instruction on the jury's advisory role does not warrant relief under Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in this case. I write separately to suggest that the Committee on Standard Jury Instructions in Criminal Cases, with the assistance of the Criminal Court Steering Committee, reevaluate the standard penalty-phase instructions and verdict form in light of Ring. A similar suggestion was first made by Justice Shaw *680 more than a year ago. See Bottoson v. Moore, 833 So.2d 693, 718 (Fla.2002) (Shaw, J., concurring in result only) (suggesting changes to standard instructions and referral to committee for study).
Although this Court has not invalidated any death sentences under Ring, five Justices, inclusive of Justice Shaw, stated or implied in their separate opinions in Bottoson that Ring warrants reevaluation of the standard instructions. At present, the standard verdict forms do not require special jury findings on aggravating circumstances and the standard instructions do not inform the jurors that they are the finders of fact on aggravating circumstances necessary to impose the death penalty. However, Justice Lewis stated that "in light of the decision in Ring v. Arizona, it is necessary to reevaluate both the validity and, if valid, the wording of these jury instructions." See Bottoson, 833 So.2d at 732 (Lewis, J., concurring in result only). In my concurring in result opinion in Bottoson, I echoed Justice Lewis's concerns. I stated that I would require explicit jury findings on each aggravator, and suggested that the instructions be revised so jurors are told they are the finders of fact on aggravators. See id. at 723 (Pariente, J., concurring in result only). Justice Quince concluded in Bottoson that although she did not consider the standard instructions to be unconstitutional, "it may be a good idea to give the jury special interrogatories at the penalty phase." Id. at 702 (Quince, J., specially concurring). Finally, Chief Justice Anstead stated that under the bare advisory recommendation required of juries under the current standard instructions, "there could hardly be any meaningful appellate review" because "it would be impossible to tell which, if any, aggravating circumstances a jury or any individual juror may have determined existed." Id. at 708 (Anstead, C.J., concurring in result only).
At the very least, jurors should be told that they are the finders of fact on aggravating circumstances. In addition, special verdict forms specifying each aggravating circumstance found by the jury will assist the trial court in determining whether to impose the death penalty, and will also facilitate review by the appellate court, especially in a harmless error analysis.
Some trial judges have been using special verdict forms since Ring; in fact, some judges were using special verdict forms even before Ring. I would thus suggest that the Committee on Standard Jury Instructions in Criminal Cases, in conjunction with the Steering Committee on Criminal Law, study the matter and propose changes to the verdict form and instructions on the jury's role in the penalty phase that this Court can then consider and either reject, accept or modify.
ANSTEAD, C.J., and LEWIS, J., concur.
NOTES
[1] Busby was also indicted for the Ard murder and was convicted in a separate trial. Busby was sentenced to death. His direct appeal is pending before this Court.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] The aggravating factors were: (1) crime committed while previously convicted of a felony and under sentence of imprisonment; (2) prior conviction of a felony involving the use or threat of violence; (3) heinous, atrocious, and cruel (HAC); and (4) cold, calculated, and premeditated (CCP).
[4] The nonstatutory mitigating factors were: (1) Globe's abusive relationship with his parents  given little weight; (2) Globe was a good friend to other inmates  given slight weight; (3) Globe met the criteria for antisocial personality disorder  given slight weight; (4) Globe gave confessions and made statements about committing the murder  given slight weight; (5) Globe's history of substance abuse  given slight weight; (6) charitable deeds done by Globe for a fellow inmate  given slight weight; (7) Globe's mother's love for him  given slight weight; (8) Globe's appropriate conduct throughout the trial  given little weight; (9) Globe was helpful to others  given slight weight; (10) Globe's capacity to form relationships  given slight weight; and (11) Globe did not have a positive role model as a child, was berated, and as a teenager was unwanted  given slight weight.
[5] Globe argues that the State did not make the adoptive admissions argument in the trial court and that the argument was not preserved for appeal. However, the trial court order clearly shows that the motion in limine was denied after the court found that the statements were adoptive admissions, and a review of the trial transcript shows that the State did in fact repeatedly argue at the hearing on Globe's motion in limine that the statements were adoptive admissions.